IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

ESTATE OF CHARLES H. MURPHY,
JR., DECEASED, ROBERT MADISON
MURPHY and MARTHA W. MURPHY,
EXECUTORS                                                    PLAINTIFF

VS.                          CASE NO. 07-CV-1013

THE UNITED STATES OF AMERICA                    DEFENDANT

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises from a Notice of Deficiency issued by the Commissioner of the Internal

Revenue Service ("IRS") to Robert Madison Murphy and Martha W. Murphy, Executors of the

Estate of Charles H. Murphy, Jr., Deceased.   In the notice, the Commissioner asserted a

deficiency of $34,051,539 in the federal estate tax of Charles H. Murphy, Jr.'s Estate.  On

February 16, 2007, the Estate filed suit in this Court seeking a refund of approximately $41

million of estate taxes and interest assessed by the IRS, along with interest on the refund.  The

Estate also seeks deductions for certain administrative expenses.  The issues pending before the

Court are:

1)  Whether the value of the assets that Charles H. Murphy, Jr. ("Mr. Murphy")

transferred to the Charles H. Murphy Family Investments Limited Partnership (the "MFLP") and

the Murphy Family Management, LLC (the "LLC"), is includable in his gross estate under

section 2036(a);[1]

---

[1] Unless otherwise indicated, all references to "Section," "§__," and "the Code" are to the
specified section in the Internal Revenue Code of 1986, as amended, and to the Code

2)  The fair market value[2] of Mr. Murphy's  95.25365% limited partner interest in the MFLP on September 20, 2002 (the "Valuation Date");

3)  The fair market value of Mr. Murphy's 49% member interest in the LLC on the Valuation Date;

4)  The fair market value of four works of art on the Valuation Date; and

5)  Whether the Estate may properly deduct under section 2053 the interest paid or to be paid on various loans to the Estate to pay its federal estate tax.[3]

On September 15-19, 2008, the case was tried to the Court.  Having considered the pleadings, the evidence presented at trial, the parties' pretrial and post-trial briefs, and the applicable law, the Court now enters its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  To the extent that any conclusion of law is more properly characterized as a finding of fact, and/or vice versa, the Court hereby adopts it as such.

## **FINDINGS OF FACT**

Many of the facts have been stipulated and are so found.  The stipulations agreed to in the Stipulation Regarding Proposed Findings of Fact are incorporated herein by this reference.

---

itself.

[2] To make this determination, the Court must determine the fair market value of the shares of Murphy Oil Corporation, Deltic Timber Corporation and BancorpSouth stock owned by the MFLP and the fair market value of Epps Plantation on the Valuation Date. It must also determine the appropriate lack of control and lack of marketability discounts to apply to Mr. Murphy's pro rata net asset value of his 95.25365% interest in the MFLP.

[3] The Estate also seeks a deduction of at least $1 million of additional administrative expenses that have been incurred since the filing of the estate tax return.  The parties have agreed to resolve this issue post-trial by agreement.  Therefore, the issue will not be addressed by the Court.

Charles H. Murphy, Jr. ("Mr. Murphy") was born in El Dorado, Arkansas, on March 6, 1920, the son of Charles H. Murphy Sr. and Bertie Wilson Murphy.  Mr. Murphy had three sisters – Theodosia M. Nolan, Caroline M. Winter and Bertie M. Smith.

In 1904, Mr. Murphy's father, Charles Murphy, Sr. came to El Dorado where he became involved in the banking, timber, and oil and gas industries.  At an early age, Mr. Murphy began assisting his father with the various family businesses.  In 1937, Charles Murphy, Sr. and his wife began pooling certain family interests together and formed Charles H. Murphy & Company, a partnership.  In 1941, Charles Murphy, Sr. suffered a debilitating stroke.  Thereafter, at the age of 21, Mr. Murphy took over the active management of the family businesses.  Around this same time, Mr. Murphy married Johnnie Walker Murphy ("Mrs. Murphy").

When World War II broke out, Mr. Murphy enlisted.  After his military service, Mr. Murphy returned to his life in El Dorado where he and Mrs. Murphy had four children.  Their oldest son, Michael ("Mike"), was born on January 31, 1948.  Their daughter, Martha, was born on January 18, 1952.  Their son, Charles III ("Chip"), was born on September 19, 1953, and their youngest son, Robert Madison ("Madison"), was born on October 6, 1957.

After the war, Mr. Murphy also returned to managing the family banking, timber, and oil and gas businesses.  In 1946, Mr. Murphy and his three sisters pooled various individual and family interests together to form their own partnership, C.H. Murphy & Company.  One of the purposes for forming this partnership was to enable their (the Murphy Family[4]) business assets to be managed collectively and to allow family members to pass ownership and management of the

---

[4] The "Murphy Family" refers to the descendants of Charles Murphy, Sr. and certain spouses of those descendants; namely, Mr. Murphy, his three sisters, two of Mr. Murphy's brothers-in-law, and their descendants.

family businesses to future generations.  The management of these collective family assets fell to Mr. Murphy as the partnership's managing general partner.  The Murphy Family also entered into other joint ventures, including the precursors of Loutre Land & Timber Company, Wyatt Land & Timber Company, and Buckmeadow Plantation, a farming partnership.

In 1950, C.H. Murphy & Company was incorporated and became Murphy Corporation. Thereafter, in 1956, Murphy Corporation became a publicly traded company.  In 1964, the company was reincorporated in Delaware and its name changed to Murphy Oil Corporation ("Murphy Oil").  Mr. Murphy served as the corporation's President from its founding in 1950 until 1972 and as its Chief Executive Officer from 1950 until 1984.  In 1984, Mr. Murphy retired as Murphy Oil's CEO but continued as Chairman of the Board of Directors until 1994.  In 1994, Madison Murphy, Mr. Murphy's youngest son, succeeded his father as Chairman of the Murphy Oil Board.[5]

As a result of Mr. Murphy's direction and leadership, Murphy Oil grew from a family-owned partnership to an international oil company.  By 1997, Murphy Oil had a market capitalization of over $2 billion with the Murphy Family controlling approximately 25% of the company's outstanding stock and Mr. Murphy and his descendants controlling approximately 9.6% of the stock.  Through their consolidated stock holdings, members of the Murphy Family continue to substantially affect the direction and management of Murphy Oil.

In addition to growing the Murphy Family's oil interests into Murphy Oil, Mr. Murphy also grew the family land base that his father, Charles Murphy, Sr., had begun acquiring in the

---

[5]  Madison Murphy began serving on Murphy Oil's Board in 1993.  He served as the Board's Chairman from 1994 until 2002.  He currently serves as a member of the Board's Executive Committee and as Chairman of the Board's Audit Committee.

early 1900s.  This land base was the origin of Deltic Timber Corporation ("Deltic"), a wholly-owned subsidiary of Murphy Oil.  Under Mr. Murphy's guidance, Deltic grew to hold over 400,000 acres of farm and timberland.  It also entered the lumber manufacturing business, owning and operating two sawmills in Arkansas.  Deltic became a publicly traded company in 1996 when Murphy Oil spun off its farm, timber and real estate business.  In 1997, the Murphy Family controlled approximately 25% of Deltic's outstanding stock, while Mr. Murphy and his descendants controlled approximately 9.6% of the stock.  Thus, as with Murphy Oil, members of the Murphy Family continue to substantially affect the direction and management of Deltic through their consolidated stock holdings and their presence on the company's Board of Directors.[6]

In addition to their holdings in the timber and oil and gas industries, the Murphy Family also owned interests in banking and had done so since the early 1900s.  The family ownership interest was in the form of shares of stock of First United Bancshares, Inc. ("First United") (a successor to First National Bank of El Dorado).  By 1997, the Murphy Family controlled approximately 8-10% of First United's stock, while Mr. Murphy and his descendants controlled approximately 4% of the stock.  Because of these holdings, Mr. Murphy was able to serve on First United's Board of Directors and was the Board's Chairman from 1981 until 1989.  In 1989, Madison Murphy succeeded Mr. Murphy to his seat on the Board.  In 2000, First United merged with BancorpSouth, Inc. ("BancorpSouth").  Madison Murphy currently sits on the

---

[6] In 1996, Mr. Murphy's youngest son, Madison, became a member of Deltic's Board of Directors.  He presently serves as a member of the Board's Executive Committee and the Corporate Governance Committee and is Chairman of the Board's Executive Compensation Committee.

BancorpSouth Board and servers as the financial expert on its Audit Committee.

During his lifetime, Mr. Murphy created several trusts for the benefit of each of his four children – Mike, Martha, Chip and Madison. These trusts were usually funded with shares of Murphy Oil stock or stock of its predecessor. Mr. Murphy also made annual exclusion gifts to his children. These gifts were usually in the form of Murphy Oil or First Commercial Corporation stock.

By the 1980s and early 1990s, Mr. Murphy had begun to turn over the management of the Murphy Family assets to the next generation.[7] During this time, Mr. Murphy came to realize that his sons, Mike and Chip, did not hold the same business/investment philosophy as he did – to hold the family's "Legacy Assets" (their interests in Murphy Oil, Deltic, and First United) long-term and to grow those assets by actively participating in the management of these companies. Over the years, both Mike and Chip developed financial problems. As a result, they had invaded trust principal, pledged trust assets as collateral for debts, and requested partial dissolution of their interests in trusts set up for their benefit. Theses trusts held, among other assets, shares of Murphy Oil, Deltic and First United stock. Mike and Chip had also sold or pledged as collateral for debts much of the stock given to them by Mr. Murphy as gifts. And, finally, Chip had a failed marriage in which he was required to give up a great deal of Murphy Oil stock that he held directly. Mr. Murphy also realized that his other two children, Martha and Madison, did share his business/investment philosophy. They had not invaded the corpus of any of their trusts and

---

[7] Madison Murphy, Mr. Murphy's son, succeeded Mr. Murphy as Chairman of Murphy Oil's Board of Directors and served on the Boards of Deltic and First United. Claiborne Deming, Mr. Murphy's nephew, become Murphy Oil's President and Chief Executive Officer.

they still owned most, if not all, of the stock gifted to them by Mr. Murphy.  In light of this realization, Mr. Murphy did not want to leave his family's assets to his children outright.  He began looking for a way to turn over the management of these assets to his children that was in keeping with his business philosophy.  Thus, starting in 1994, Mr. Murphy began working closely with his youngest son, Madison, to reorganize his personal and private business assets in a way to accomplish these goals.

In 1994, Mr. Murphy formed revocable trusts for three of his four children (the Michael W. Murphy 1994 Revocable Trust, the Martha W. Murphy 1994 Revocable Trust, and the Robert Madison Murphy 1994 Revocable Trust).  Mr. Murphy contributed 100,000 shares of Murphy Oil stock to each of these trusts.  Under the terms of the trust agreements, Mr. Murphy was trustee and beneficiary of each trust.  Upon Mr. Murphy's death, Mike, Martha and Madison would receive the assets in their respective trusts.  The agreements also gave Mr. Murphy the right to amend, modify, or revoke each trust.

By 1996 and 1997, Mr. and Mrs. Murphy were well into their retirement.  He was wanting to travel and spend more time aboard his boat.  Thus, Mr. Murphy's planning to pass control of his family's assets to his children became more formalized.  In 1996, Mr. Murphy, Mrs. Murphy and their son, Madison, met with Richard A. Williams, an attorney, to discuss these plans.  Mr. Williams recommended to Mr. Murphy the use of a family limited partnership to accomplish his goal of pooling the family's Legacy Assets together under centralized management and to protect those assets from being dissipated.  The idea of using a partnership was familiar to Mr. Murphy as his family had successfully used partnerships for decades.  Mr. Murphy decided that a partnership, with a limited liability company as its general partner, was

the best vehicle to manage his family's Legacy Assets.

Before the partnership was formed, Mrs. Murphy unexpectedly died from a rare lung disease in August 1997.  In September 1997, Mr. Murphy met with Mr. Williams and discussed his plans to go forward with the formation of the partnership.  At this point, Martha joined her father and her brother, Madison, in discussions regarding the partnership's formation.  Both Madison and Martha had input into how the partnership and the limited liability company would be structured, with Martha being represented by her own attorney.  During these discussions, Mr. Murphy, Madison and Martha decided that Mr. Murphy would hold a non-controlling interest (49%) in the partnership's general partner, with Madison and Martha each holding a 25.5% member interest.  This would enable Mr. Murphy a say in any major decision requiring a unanimous vote, but did not require him to make the day to day decisions regarding the partnership's operations.  Those decisions would be made by Madison and Martha, as the controlling interest holders in the general partner.

On December 1, 1997, Mr. Murphy formed the Charles H. Murphy Family Investments Limited Partnership (the "MFLP") and the Murphy Family Management, LLC (the "LLC").  The LLC serves as the MFLP's general partner.  Under the MFLP partnership agreement, the general partner is responsible for the exclusive management, operation, and control of the partnership and its affairs.  All partnership distribution decisions are vested in the general partner. Distributions of distributable cash must be made pro rata to the partners in accordance with their sharing ratios.  The ownership and transferability of a partnership interest is restricted, only allowing the transfer of limited partnership interests with prior written consent of all the partners. Without consent, limited partnership interests may only be transferred to "Permitted

8

Transferees", i.e., spouses, descendants, parents, siblings, sibling descendants, and various entities associated with the partners or Permitted Transferees. The partnership also has the unilateral option of acquiring any interest transferred to an unauthorized transferee, a creditor, or a spouse in a failed marriage. All general partner decisions are made by majority vote of the member interests in the LLC. However, to terminate, liquidate, or wind up the MFLP, requires a unanimous vote of the MFLP partners.

Mr. Murphy then invited his four children to contribute assets to and participate in the MFLP. Martha and Madison accepted their father's invitation. Mike and Chip did not. Thereafter, Mr. Murphy, Madison, and Martha made contributions to the MFLP and/or the LLC in two phases.

On February 19, 1998, Mr. Murphy contributed shares of Legacy Assets (Murphy Oil, Deltic, and First United stock), along with certain other assets, to the MFLP. These partnership contributions were made on behalf of himself or as trustee of the Michael W. Murphy 1994 Revocable Trust ("Mike's 1994 Trust"), the Martha W. Murphy 1994 Revocable Trust ("Martha's 1994 Trust"), and the Robert Madison Murphy 1994 Revocable Trust ("Madison's 1994 Trust"), and the Johnnie W. Murphy Exempt Children's Trust ("Mrs. Murphy's Trust").[8] Mr. Murphy's total contributions to the MFLP were then worth $88,992,087 and amounted to approximately 41% of the value of Mr. Murphy's total assets at the time.

On February 19, 1998, Mr. Murphy also contributed shares of Legacy Assets to the LLC, then worth $1,021,311. On May 22, 1998, Madison and Martha made their contributions to the

---

[8] This testamentary trust was created in Mrs. Murphy's will for the benefit of her children. Mr. Murphy was trustee of this trust.

LLC.  Madison's contribution consisted of shares of Legacy Assets that had a value at the time of $526,195.  Martha's contribution also consisted of shares of Legacy Assets having a value of $526,195.  Mr. Murphy's resulting member interest in the LLC was 49% and Madison and Martha's was 25.5% each.  Thus, Madison and Martha collectively held a majority of the member interest in the LLC.

After all contributions were made, the LLC held a 2.25% general partnership interest in the MFLP.  Mr. Murphy held, individually or as trustee of various trusts, a 96.75% limited partnership interest in the MFLP.  Each interest owner in the MFLP and the LLC received an interest in the entity proportionate to the value of the assets contributed, with a portion of Mr. Murphy's contribution being allocated to Hendrix College as a charitable gift.  The value of the assets contributed by each owner was credited to his, her, or its capital account.

At the time the MFLP was funded, Mr. Murphy retained approximately $130 million in non-Legacy Assets outside the partnership.  The majority of these assets were shares of First Commercial Corporation ("First Commercial") stock.  These retained assets represented over 50% of Mr. Murphy's wealth and provided Mr. Murphy with sufficient funds to pay his living expenses for the remainder of his life and to pay his estate taxes upon his death.

In late January 1998, Mr. Williams advised Mr. Murphy that he should consider transferring a portion of his First Commercial stock to a Frozen Retained Income Trust ("FRIT"). This transfer would trigger an immediate gift tax, but would freeze the value of the stock for transfer tax purposes.  Mr. Murphy would receive all the income from the FRIT, but any appreciation in the stock's value would inure to the benefit of a trust created for his descendants. Mr. Murphy initially rejected this advice.  However, in the spring of 1998, First Commercial

announced that it was merging with Regions Bank.  This announcement made Mr. Murphy

reconsider Mr. Williams' advice because he did not share Regions' management philosophy.

Thereafter, on May 14, 1998, Mr. Murphy transferred one million shares of First Commercial

stock (worth approximately $72,000,000) to the FRIT.  This left Mr. Murphy with approximately

$50 million of First Commercial stock outside the FRIT.  On July 31, 1998, First Commercial

merged with Regions Bank.  Thereafter, the FRIT and Mr. Murphy received common stock in

Regions Bank in return for the First Commercial stock held by each.  In 1999, Mr. Murphy filed

a gift tax return with the IRS reporting the transfer of the First Commercial stock to the FRIT and

the payment by the FRIT of $25.6 million in gift tax.

　　　　After the MFLP was formed and funded, Mr. Murphy removed himself more and more

from the management of the family's assets.  Accordingly, Madison and Martha began to take

over the day to day management of the partnership and its various employees.  In keeping with

their business/investment philosophy, no shares of Murphy Oil, Deltic or BancorpSouth[9] stock

were sold by the MFLP.  In order to manage these assets effectively, Madison continued to serve

on the Board of Directors of Murphy Oil, Deltic and BancorpSouth.  These "seats at the

management table" of the family's Legacy Assets allowed the MFLP (through Madison) a voice

in the growth and continued success of these companies, thereby, ensuring the growth and

continued success of the partnership.

　　　　In furtherance of one of his purposes for creating the MFLP, Mr. Murphy began making

annual gifts of interests in the MFLP to his children, their spouses and his eight grandchildren in

---

[9] The First United shares that were contributed to the MFLP in 1998 by Mr. Murphy, Madison and Martha were exchanged for shares of BancorpSouth stock after First United merged with BancorpSouth in 2000.

1998.  These gifts continued until Mr. Murphy's death in 2002.  Mr. Murphy filed gift tax returns with the IRS each year reporting these gifts of partnership interests.

In 2000, Mr. Murphy, Madison and Martha learned that Deltic planned to exit the farming business.  It planned on selling approximately 65,000 acres of mostly farmland, along with a limited number of remote tracts of timberland.  Much of this acreage had been acquired by Mr. Murphy and his father prior to 1950.  Given the history of this land, the partnership's desire to invest in and hold historical family assets, and its goal to teach the next generation how to operate a business and manage the family's assets consistent with Mr. Murphy's philosophy, the MFLP decided to purchase some of the acreage that Deltic was selling.  The only disagreement between Mr. Murphy, Madison and Martha was the number of acres to buy.  Mr. Murphy wanted to buy all 65,000 acres, while Madison and Martha took a more conservative approach.  Eventually, it was decided that the MFLP would purchase twelve farmland tracts and two timberland tracts for a total of 16,661 acres.  The land was purchased by Epps Plantation LLC ("Epps"), a limited liability company wholly-owned by the MFLP, using the proceeds from a $16 million loan from Mr. Murphy's FRIT.  Thereafter, Hard Bargain Farms Partnership ("Hard Bargain"), an entity comprised of Mr. Murphy's children, grandchildren and spouses who are parents of grandchildren, was formed to operate Epps.

After purchasing Epps, the MFLP made significant capital improvements to the plantation.  It purchased an additional 700 acres of land and sold a small tract of land.  The MFLP also purchased and manages the seven-story Union Building in El Dorado.

Since its creation, the MFLP has engaged in business operations, purchased and sold assets, hired and managed employees, prepared (monthly) and disseminated (quarterly) financial

statements to its partners, filed federal and state tax returns, and maintained its own bank account.  The partners have met from six to eight times a year to discuss partnership business.  They have also respected the partnership as an entity separate and apart from themselves.  Accordingly, Mr. Murphy did not commingle any of his personal assets with the assets of the MFLP.

The MFLP made two distributions during Mr. Murphy's life.  The first was a pro rata cash distribution in the partners to cover the federal taxes attributable to the MFLP's 1998 income.  After this distribution, no other cash distributions were made.  Rather, the MFLP retained all income to repay loans incurred by it to purchase assets such as Epps Plantation.  The only other distribution by the MFLP was made in December 2000.  It was a distribution made to Mr. Murphy of shares of Loutre Land and Timber Company stock.[10]  As a result of this distribution, Mr. Murphy's limited partner interest in the MFLP was reduced by 0.02875% and the other partner's ownership percentages were increased by a total of 0.02875%.  Each partner's capital account in the MFLP was adjusted accordingly to reflect the change in ownership percentage.

In 1997, at the time the MFLP was formed, Mr. Murphy was 77 years old.  He had no life-threatening illnesses and was in good heath.  During the next five years, Mr. Murphy traveled extensively.  He spent time aboard his 73 foot yacht, making both trans-Atlantic and trans-Pacific voyages.  Then, in late 2001, Mr. Murphy began experiencing chest pains.  He consulted a cardiologist who discovered blockage in his coronary arteries.  Mr. Murphy was informed that

---

[10] This distribution occurred in order for Loutre Land and Timber Company to convert from a C-Corporation to an S-Corporation.

this condition could be controlled by medication if he would change his lifestyle.  Rather than curtail his active lifestyle, Mr. Murphy decided to undergo surgery to alleviate the blockage. Thereafter, in December 2001, Mr. Murphy underwent elective quintuple-heart-bypass surgery. The surgery went well.  However, Mr. Murphy developed a staph infection which lead to his death on March 20, 2002.

After Mr. Murphy's death, Madison and Martha became co-executors of his Estate (the "Estate").  The Estate determined that a total of $46,265,434 in estate taxes was owed to the IRS and the State of Arkansas.  In order to raise the funds to pay this estimated tax, the Estate sold its shares of Regions Bank stock.  However, because the value of the stock had declined substantially in value, the Estate only had liquid assets of $29,831,599 available to pay the tax.[11] The Estate then borrowed $5.4 million from its residual beneficiary, the 1998 Murphy Family Trust.[12]  This left the Estate with a cash shortfall of $11,033,835.  In order to cover this shortfall, the Estate borrowed $11,040,000 from the MFLP.[13]  Thereafter, on December 20, 2002, the Estate paid its estimated payment of estate taxes, both state and federal, of $46,265,434.

The $11,040,000 loan from the MFLP to the Estate was secured by a 14.36% limited

---

[11] The other principal assets in the Estate at the time were non-controlling, non-marketable interests in the MFLP, the LLC, an interest in Loutre Land and Timber Company, and an interest in Wyatt Land & Timber Company.

[12] After specific bequests were made under Mr. Murphy's will, the residue of his Estate passed to the Family Trust.  Under the terms of the trust, the trust property was to be divided into four equal shares.  These shares were to be administered as separate sub-trusts for the benefit of each of Mr. Murphy's four children.  Madison and Martha were named as trustees of the Family Trust.

[13] The MFLP sold $13,516,393 worth of Murphy Oil and BancorpSouthstock to fund this loan.

partnership interest in the MFLP.  The loan has a fixed rate of interest of 3.31%  and requires a

payment of $500,000 per year, with the outstanding balance and all accrued and unpaid interest

to be paid in full on December 19, 2011.  It does not permit the Estate to prepay the loan.  Thus,

$3,170,250 of interest will be paid by the Estate over the term of the loan.  Accordingly, the

Estate reported this $3,170,250 interest obligation as a section 2053 deductible administrative

expense on the Estate's tax return.

On June 20, 2003,[14] the Estate filed its Form 706, United States Estate (and Generation

Skipping Transfer) Tax Return (the "Return") with the IRS.  On the Return, the Estate elected to

value the gross estate as of September 20, 2002 (the "Valuation Date"), pursuant to section

2032(a).  Among the assets included in Mr. Murphy's gross estate at the time of his death was a

95.25365% limited partner interest in the MFLP (consisting of Mr. Murphy's 76.22105% limited

partner interest and the 6.3442% interests of each of the three 1994 Revocable Trusts, i.e.,

Mike's 1994 Trust, Martha's 1994 Trust and Madison's 1994 Trust),[15] a 49% member interest in

the LLC,  a 25% interest in Wyatt Land & Timber Company, an approximate 2.61% interest in

Loutre Land and Timber Company, $33,380,168 of Regions Bank stock, and four works of art (*A

Stroll in the Park* by Childe Hassam, *New Orleans Landscape* by Richard Clague, *Landscape

with Yellow* and *Blue Sky* by Emil Nolde, and *Danseuse Espagnole* Edgar Degas).  The Estate

listed the value of the 95.25365% limited partner interest in the MFLP at $74,082,000 and the

---

[14] On December 20, 2002, the Estate filed for an automatic 6-month extension of time to file its Form 706.  Therefore, the Estate's federal tax return was due June 20, 2003.

[15] Since each of these trusts was revocable by Mr. Murphy during his lifetime, the value of each trust's assets was included in Mr. Murphy's gross estate pursuant to section 2038.

value of the 49% member interest in the LLC at $706,000.  The four works of art were valued at $292,000 ($150,000 for *A Stroll in the Park;* $42,000 for *New Orleans Landscape;* $50,000 for *Landscape with Yellow and Blue Sky*; and $50,000 for *Danseuse Espagnole*).

On June 15, 2006, the IRS issued a Notice of Deficiency to the Estate in the amount of $34,051,539.  In the notice, the Service asserted that the Estate undervalued certain assets (including Mr. Murphy's interest in the MFLP and the LLC and the four works of art) and overstated its attorney fees, accountant fees, and interest expenses.  It claimed that 1) Mr. Murphy's 95.25365% limited partner interest in the MFLP had a value of $131,541,819, an increase of $57,459,819 over the value on the return, 2) Mr. Murphy's 49% member interest in the LLC had a value of $1,903,000, an increase of $1,197,000 over the value on the return, and 3) the four works of art had a value of $525,000 ($185,000 for *A Stroll in the Park;* $150,000 for *New Orleans Landscape;* $90,000 for *Landscape with Yellow and Blue Sky*; and $100,000 for *Danseuse Espagnole*), an increase of $233,000 over the value on the return.

The Estate did not have sufficient liquidity to pay the additional tax asserted by the IRS in the Notice of Deficiency because its principle assets at that time were the non-controlling, non-marketable interests in the MFLP and the LLC.  In order to raise the necessary funds, the Estate borrowed approximately $41 million from four trusts created for the benefit of Mr. Murphy's four children (the Michael Walker Murphy Trust u/a/d February 1, 1956, the Martha Wilson Murphy Trust u/a/d February 1, 1956, the Charles Haywood Murphy III Trust u/a/d February 1, 1956 and the Robert Madison Murphy Trust u/a/d February 1, 1956) (hereinafter referred to as the "1956 Trusts").  Proceeds from this $41 million loan were used to pay the additional estate tax and interest.

16

On September 8, 2006, the Estate paid the additional tax of $34,051,539 plus $7,721,720.50 in accrued interest from December 20, 2002.  On the same day, the Estate filed a Claim for Refund and Request for Abatement for $41,770,308, plus interest.  On October 3, 2006 and January 17, 2007, the IRS denied the Estate's claim for refund.  Thereafter, on February 16, 2007, the Estate filed the pending lawsuit seeking a refund of approximately $41 million of estate taxes and interest assessed by the IRS, along with interest on the refund.

This case was tried to the Court on September 15-19, 2008.  During the trial of this matter, Madison Murphy, Richard Williams, Nathan Evers and Martha Murphy testified regarding the Murphy family history, Mr. Murphy's long-term business/investment philosophy, Mr. Murphy's purpose for forming the partnership, the events leading up to the partnership's formation, and the operation of the MFLP during and after Mr. Murphy's death.  They testified that Mr. Murphy's purpose for forming the MFLP was to pool the family's Legacy Assets into one entity that would be centrally managed in a manner that was consistent with his business/investment philosophy, to pass the management responsibility of the Legacy Assets over to the next generation, to enable him to make lifetime gifts of interests in the MFLP while ensuring that the voting of the underlying assets stayed in one place, to educate his descendants about wealth acquisition, management and preservation, and to protect the Legacy Assets from creditors, failed marriages and from being dissipated by future generations.  They also testified that since its formation, the MFLP has been managed in accordance with Mr. Murphy's business/investment philosophy, the partnership, through Madison, has taken an active role in the management of its Legacy Assets, it has purchased and operated Epps Plantation, it has purchased and operated the Union Building in El Dorado, and it has explored other business

17

opportunities.  The Court found this testimony credible.   Accordingly, the Court finds that Mr.

Murphy created the MFLP in good faith and for legitimate and significant non-tax purposes.

**I.  Fair Market Value of Mr. Murphy's MFLP Interest**

Mr. Murphy owned a 95.25365%[16] limited partner interest in the MFLP.  During the trial,

the parties' financial experts, Donald Barker[17] and Francis Burns,[18] testified as to the fair market

value[19] of this limited partner interest.  Barker determined the fair market value of Mr. Murphy's

limited partner interest in the MFLP to be $74,150,000.  Mr. Burns concluded the fair market

value of Mr. Murphy's limited partner interest to be $106,235,957.

A.  Value of Partnership Assets

In determining the value of Mr. Murphy's limited partner interest, both Barker and Burns

applied the net asset value approach.  Under this approach, the net asset value is determined by

deriving the value of the partnership's underlying assets (Murphy Oil, Deltic and BancorpSouth

stock and Epps Planation) and then subtracting its liabilities.  Once the net asset value is

---

[16] This 95.25365% limited partner interest consisted of a 76.22105% interest owned by
Mr. Murphy; 6.3442% interest held by Mike's 1994 Trust; 6.3442% interest held by
Martha's 1994 Trust; and 6.3442% interest held by Madison's 1994 Trust.

[17]  Donald Barker testified on behalf of the Estate.  He is a Senior Managing Director and
Owner of Howard Frazier Barker Elliott, Inc.  Barker is an Accredited Senior Appraiser
of the American Society of Appraisers, a Chartered Financial Analyst, and the Past
Chairman and Current Member of the Valuation Advisory Committee of the National
ESOP Association.  He first prepared his appraisal in 2002 for use in the Estate's tax
return.

[18] Francis Burns testified on behalf of the IRS.  He is Vice President of CRA
International.  Burns is an Accreditied Senior Appraiser in Business Valuation within the
American Society of Appriaisers, and a Member of the Institute of Business Appraisers.

[19] The fair market value is "the price at which the property would change hands between a
willing buyer and a willing seller, neither being under any compulsion to buy or to sell
and both having reasonable knowledge of relevant facts."  Treas. Reg. § 20.2031-1(b).

determined it is multiplied by Mr. Murphy's percentage of interest in the MFLP (95.25365%) to determine, his pro rata net asset value. This pro rata net asset value is then discounted for lack of control and lack of marketability to obtain the fair market value of Mr. Murphy's limited partner interest in the MFLP.

     1)  Value of the Murphy Oil, Deltic and BancorpSouth Stock

In determining the value for the shares of Murphy Oil, Deltic and BancorpSouth stock, certain valuation discounts (Rule 144 discount[20] and blockage discount[21]) were applied by both experts. The appropriate size of the discounts is in dispute.

In valuing the MFLP's Murphy Oil stock, Barker opined that a 5% Rule 144/ blockage discount on the value of the stock was appropriate. In determining the appropriate blockage discount, Barker considered not only the size of the block of stock[22] relative to the daily trading volume, but he also considered qualitative factors regarding Murphy Oil such as the volatility of the stock, the actual price change in the stock under recent and preceding market conditions, the company's current economic outlook, the trend of the price and the financial performance of the

---

[20] This discount is a valuation adjustment to the market price of shares to reflect the trading restrictions placed on the shares because of insider trading rules under SEC Rule 10b-5 and SEC Rule 144. Rule 10b-5 prohibits a corporate insider from buying or selling shares of stock if he is in possession of insider information not available to the public. Rule 144 limits the number of shares an insider can sell. It has long been recognized that shares subject to sales restrictions have a lower value than shares that can be freely traded. *See Litman, et al. v. United States,* 78 Fed. Cl. 90 (2007).

[21] This discount is a valuation adjustment to the market price of shares to reflect the downward price pressure when a large block of stock is sold into the market over a short period of time.

[22] The 1,225,550 shares of Murphy Oil stock owned by the Partnership comprised approximately 2.67% of the company's outstanding shares.

stock, the trend of the company's earnings and the existence of any resale restrictions on the

stock.  Burns did not consider any of these additional qualitative factors when determining the

appropriate blockage discount on the MFLP's Murphy Oil stock.  He also did not consider the

effect that SEC sales restrictions[23] had on the value of the partnership's shares of Murphy Oil

stock.  Thus, Burns' 1.9% discount does not reflect the partnership's inability to sell its shares on

the Valuation Date.   The Court finds Barker's valuation analysis more credible than Burns'

analysis; thus, a 5% discount on the MFLP's Murphy Oil stock is appropriate.  Accordingly, the

Court adopts the valuation of Donald Barker and finds the fair market value of the shares of

Murphy Oil stock owned by the MFLP was $97,741,000,[24] based upon the average traded value

of the shares on the Valuation Date ($83.95/share) times the number of shares owned by the

MFLP (1,225,550), less the 5% Rule 144/blockage discount.

In valuing the Deltic stock owned by the MFLP on the Valuation Date, Barker opined that

a 10.6% Rule 144/blockage discount on the value of the stock was appropriate.  This

determination consisted of two parts.  First, Barker determined the blockage discount on the

119,475 unrestricted shares of Deltic by considering the size of the block of stock[25] relative to the

daily trading volume, the volatility of the stock, the actual price change in the stock under recent

and preceding market conditions, the company's current economic outlook, the trend of the price

---

[23] Under federal securities laws, the MFLP was restricted from selling its shares of
Murphy Oil stock for an indefinite period of time because, on the Valuation Date,
Madison Murphy was in possession of material insider information regarding a potential
stock split of the company's stock.

[24] This figure is rounded.

[25] The 430,397 shares of Deltic stock owned by the Partnership comprised approximately
3.6% of the company's outstanding shares.

and the financial performance of the stock, the trend of the company's earnings and the existence of any resale restrictions on the stock. He determined that the discount to be applied to these unrestricted shares should be 5%. Next, Barker determined the discount for the remaining 310,922 shares of Deltic subject to Rule 144 volume limitations. He reasoned that these shares would be sold in a private transaction and, thus, determined the discount by ascertaining the theoretical cost of a put option using the Black Scholes put option approach. From this, Barker determined the discount for the restricted Deltic shares to be 12.7%. He then calculated the weighted average discount for the entire block of Deltic stock to be 10.6%.

In making his discount determination for the unrestricted Deltic stock, Burns applied the same methodology he used in calculating the blockage discount on the Murphy Oil stock. He did not consider any additional company or market specific factors and trends in making his determination. Burns then used an approach (an option collar approach) in determining the discount on the 310,922 restricted shares of Deltic stock that has previously been rejected.[26] The Court finds Barker's valuation analysis more credible than Burns' analysis; thus, a 10.6% discount on the MFLP's Deltic stock is appropriate. Accordingly, the Court adopts the valuation of Donald Barker and finds the fair market value of the shares of Deltic stock owned by the MFLP was $8,741,000[27] on the Valuation Date, based upon the average traded value of the shares on the Valuation Date ($22.71/share) times the number of shares owned by the MFLP (430,397), less the 10.6% Rule 144/blockage discount.

Finally, in valuing the MFLP's BancorpSouth stock, Barker concluded that a 1.3% Rule

---

[26] *See Litman v. United States,* 78 Fed. Cl. 90, 139 (2007).

[27] This figure has been rounded.

21

144/blockage discount on the value of the BancorpSouth stock was appropriate, while Burns concluded that a 1.2% discount should be applied.  In determining the appropriate blockage discount, Barker again considered the block of stock[28] relative to the daily trading volume, the volatility of the stock, the actual price change in the stock under recent and preceding market conditions, the company's current economic outlook, the trend of the price and the financial performance of the stock, the trend of the company's earnings and the existence of any resale restrictions on the stock.  Burns did not consider any of these additional qualitative factors when determining his blockage discount on the MFLP's BancorpSouth stock.  The Court finds Barker's valuation analysis more credible than Burns'analysis; thus, a 1.3% discount on the MFLP's BancorpSouth stock is appropriate.  Accordingly, the Court adopts the valuation of Donald Barker and finds the fair market value of the shares of BancorpSouth stock owned by the MFLP was $5,852,000[29], based upon the average traded value of the shares on the Valuation Date ($19.85/share) times the number of shares owned by the MFLP (298,861), less the 1.3% Rule 144/blockage discount.

     2)  Value of Epps Plantation

Under the net asset approach, in addition to valuing the fair market value of the shares of stock (Murphy Oil, Deltic and BancorpSouth) held by the MFLP, the fair market value of Epps Plantation[30] must also be determined in order to determine the value of Mr. Murphy's limited

---

[28] The 298,861 shares of BancorpSouth stock owned by the Partnership comprised approximately 0.37% of the company's outstanding shares.

[29] This figure has been rounded.

[30] Epps is a plantation in East Carroll, Madison, Richland and West Carroll Parishes, Louisiana owned by the MFLP.  It consists of some 16,611 acres on which cotton, rice, grain, soybeans, corn and timber is produced.  Of this 16,611 acres, 13,481 acres is

partner interest in the MFLP.  During the trial, the Estate called Robert Wood[31] as an expert

witness as to the fair market value of Epps.  Ralph Day[32] and Randy Milton[33] testified on behalf

of the IRS.  Day testified as to the value of the 3,130 acres of timberland, while Minton testified

as to the value of the 13,481 acres of farmland.  Wood testified that the value of Epps on the

Valuation Date was $18,189,000.  Day and Minton valued Epps at $20,785,959 ($6,285,959 for

the timberland and $14,500,000 for the farmland).

In valuing the timberland on Epps, Wood and Day both valued the bare land at $600 per

acre.  The valuation difference between the two appraisals is based upon the volume of timber on

the property and the value of that timber, i.e., the per unit price of the various species of timber.

To determine the volume of the timber on the Valuation Date, Wood used a timber cruise

preformed by Deltic Timber in 2000 as part of its sale of Epps to the partnership.  He then

adjusted the timber volumes found in the cruise upward by 3% per year to account for the two

years of growth between the cruise and the Valuation Date (the 2001 and 2002 growing seasons).

As a result of this calculation, Wood determined that Epps had 16,110.868 Thousand Board Feet

farmland and the remaining 3,130 acres is timberland.

[31] Robert Wood is a Louisiana-certified real estate appraiser.  He has thirty-three years of experience in and around East Carroll, Madison, Richland and West Carroll Parishes, Louisiana.  He has performed approximately 800-900 appraisals.  The majority of Wood's business is agricultural farm appraisals.  He is not a licensed forester.

[32] Ralph Day is President of Day Forest Management and Appraisal, Inc.  He is a licensed and registered forester and has worked as a forester for thirty-two years.  Day is also a certified real estate appraiser.  He is an Accredited Senior Appraiser by the American Society of Appraisers.

[33] Randy Milton is President of Capital Research, Inc.  He is an Accredited Rural Appraiser, a Member of the Appraisal Institute, a member of the American Society of Farm Managers and Rural Appraisers, and a certified general appraiser.  He has been a land appraiser since 1987.

of timber on the Valuation Date.  Wood next determined the value (price) of the timber by

consulting *Timber Mart – South*, a trade publication that publishes current market values of

various timber species.  He also consulted Chip Sullivan, a local logging contractor, regarding

timber prices in the area around Epps.  Sullivan informed Wood that oak was bringing different

values at the local mills depending on the species.  Wood found Sullivan to be reliable and thus,

adjusted his prices accordingly.  Based upon the volume and value of the timber, Wood

determined that the fair market value of the timber on the Valuation Date was $2,760,105[34] or

$166 per acre.[35]

In determining the volume of the Epps timber on the Valuation Date, Day did not use the

timber cruise conducted by Deltic in 2000 because it was unclear if it contained independently

verifiable data.  Instead, Day used a timber cruise conducted by Mark C. Brown Forestry

Services, a certified forester from Rayville, Louisiana.  This cruise was obtained by Epps in 2005

in preparation of it harvesting timber on the plantation.  Day then adjusted the timber volumes

found in the 2005 downward from 3-5%, depending on the growth rate of each timber species,

for each of the two years between the date of the cruise and the Valuation Date.  As a result of

this calculation, Day determined that Epps had 17,612.300 Thousand Board Feet of timber on the

Valuation Date.  Day next determined the value (price) of the various species of timber by

consulting four industry sources, *Forest 2 Market; Timber Mart – South, Louisiana Department*

---

[34] This figure has been rounded.

[35] In his appraisal, Wood determined the value of Epps, both farm and timberland, as a
whole.  In making his timber valuation, he determined that the timber on Epps added
$166 per acre to the total value of the plantation.  As such, he did not give a separate
timberland value (timber value plus value of the bare land) in his appraisal.

*of Agriculture & Forestry Quarterly Report of Forest Products;* and *Mississippi Timber Price Report*.  He also considered the quality of the timber on Epps in determining the price for each species.  Based upon the volume and the value of the timber, Day determined that the fair market value of the timber on the Valuation Date was $4,407,959.[36]  Adding this figure to the value of the bare land (3,130 acres x $600/acre = $1,878,000), Day concluded that the total value of the Epps timberland was $6,285,959 ($4,407,959 + $1,878,000 = 6,285,959).

In reviewing the expert appraisals and the testimony at trial, the Court finds that Day's analysis and valuation of the Epps timberland is more credible than Wood's.  Therefore, the Court adopts the valuation of Ralph Day and finds that the fair market value of the timberland on Epps Plantation was $6,286,000[37] on the Valuation Date.

In determining the value of the 13,481 acres of farmland on Epps, both Wood and Robert Milton relied primarily on the market data or sales comparison approach.[38]  This approach compares the subject property with similar properties that were sold within a reasonable time frame.

In determining the value of the Epps farmland, Wood viewed ten comparable sales, focusing his comparable sales in Madison and East Carroll Parishes.  He then analyzed how these comparable sales related to Epps in terms of financing, size, land, cropland ratio, market conditions, improvements, location and allotments.  After analyzing the sales, Wood adjusted the

---

[36] This figure has been rounded.

[37] This figure has been rounded.

[38] In addition to the market data/sales comparison approach, Wood applied the earnings approach and the cost approach to determine the value of the property.  In addition to the market data/sales comparison approach, Milton also applied the income approach.

comparables to mirror Epps as closely as possible in size, land, crop ratio, improvements, location and allotments.[39]  After making these adjustments, Wood determined that the market value of the Epps farmland was $929 per acre[40] or $12,524,000.[41]

In making his valuation, Milton viewed eight comparable sales adjusting each for certain variables.  However, one of Milton's comparables (Comparable #1) was not in close proximity to Epps.  It was located some 75 miles away in Tensas Parish, Louisiana.  Milton also did not apply a downward size adjustment when comparing Epps (13,481 acres) to his various comparable sales which ranged in size from 1,233 to 4,786 acres.[42]  After making these adjustments, Milton determined that the market value of the Epps farmland was $1,075 per acre or $14,500,000.[43]

In reviewing the expert appraisals and the testimony at trial, the Court finds that Wood's analysis and valuation of the Epps farmland is more credible than Milton's analysis and valuation.  Therefore, the Court adopts the farmland portion of Robert Wood's valuation and finds that the fair market value of the farmland on Epps Plantation was $12,524,000 on the Valuation Date.

Thus, the Court finds that the fair market value of Epps Plantation on the Valuation Date

---

[39] Wood did not make any adjustments for financing or market conditions.

[40] Wood determined the market value of Epps was $1,095 per acre for the total 16,611 acres, inclusive of timber and timberland values.  In order to obtain a value for the farmland alone, the 3,310 acres was removed as well as the timber value attributable to the timberland ($166 per acre) to arrive at a value of $929 per acre or $12,524,000 for the 13,481 acres of farmland.

[41] This figure has been rounded.

[42] This is so, even though Milton used an upward price adjustment when appraising the 1,555 acre Buckmeadow Plantation for the Estate

[43] This figure has been rounded.

was $18,810,000 ($12,524.000 (value of farmland) + $6,286,000(value of timberland)).

    B)  Value of 95.25365% Limited Partner Interest

    Taking the value of the MFLP's assets (shares of Murphy Oil stock ($97,741,000), Deltic

stock ($8,741,000), BancorpSouth stock ($5,852,000) and Epps Plantation ($18,810,000), along

with its other assets), and subtracting its liabilities, the total net asset value of the MFLP on the

Valuation Date was $132,416,538.  Taking this net asset value and multiplying it by Mr.

Murphy's 95.25365% limited partner interest in the MFLP, the pro rata net asset value of Mr.

Murphy's limited partner interest is $126,132,000[44] ($132,416,538 x 95.25365% =

$126,131,586).

    1)  Lack of Control Discount

    Mr. Murphy's 95.25365% limited partner interest in the MFLP was a non-controlling

interest.  Therefore, to determine the fair market value of this limited partner interest, the pro rata

net asset value of his limited partner interest ($126,132,000) should be adjusted for the interest's

lack of control.[45]  The size of this discount is in dispute.

    The parties' experts, Donald Barker and Francis Burns, both determined the lack of

control discount by dividing the MFLP's assets into separate categories (cash/cash equivalents,

equities and fixed assets (Epps Plantation)), determining the size of the discount for each asset

category and, then, calculating a weighted average lack of control discount.

    In determining the appropriate lack of control discount for the partnership's equity assets,

---

[44] This figure has been rounded.

[45] This adjustment reflects the fact that minority interest shareholders can not make decisions regarding such things as distributions and asset management.  This discount is routinely applied in valuing partnership interests.

both Barker and Burns relied on data from closed-end equity funds.  Barker used data from some nineteen funds that were the most similar to the MFLP's equity category.   After analyzing the data from these funds, Barker determined that an 11% discount was appropriate for the equity portion of the MFLP's assets.  Burns did not screen the funds.  Rather, he used data from thirty funds, seventeen of which were included in Barker's nineteen funds.  After analyzing the data from these funds, Burns determined that a 6.9% discount was appropriate for the equity portion of the partnership's assets.

The determination of the appropriate lack of control discount for the partnership's cash/cash equivalents is a matter of the appraiser's judgment because there are no publicly traded closed-end funds whose holdings consist solely of cash or cash equivalents.  In making his determination, Barker took into account the partnership's abnormally large cash balance on the Valuation Date and reasoned that it would be invested in equities or real estate in line with the partnership's long-term goals.  He also considered the fact that an investor in the partnership would have no control over this cash.  As a result, he reasoned that a 5% discount was appropriate for the cash/cash equivalent portion of the MFLP's assets.  Burns did not consider this.  Rather, he based his determination on the fact that discounts generally decline as the asset category moves down the scale of investment risk.  As a result, Burns reasoned that a 2% discount was appropriate for the cash/cash equivalent portion of the MFLP's assets.

Finally, in determining the appropriate lack of control discount for the partnership's fixed assets (Epps), both Barker and Burns relied on data collected by Partnership Profiles, Inc. for real estate limited partnerships traded in the secondary markets.  Looking at data derived from partnerships that invested primarily in undeveloped land, Burns concluded that a 35% discount

28

was appropriate for the fixed asset portion of the MFLP's assets.  Looking at the same data, Barker concluded that a portion of the 35% discount used by Burns included a discount for the lack of marketability of these partnerships.  In light of this, Barker determined that a 26.3% discount was more appropriate for the partnership's fixed assets.

From these discounts, Barker and Burns each computed a weighted average (blended) lack of control discount to be applied to Mr. Murphy's limited partnership interest in the MFLP. Barker calculated his lack of control discount to be 12.5%.  Burns calculated his discount to be 10%.

In reviewing the expert report and the testimony at trial, the Court finds Barker's valuation analysis more credible than Burns' analysis; thus, a 12.5% lack of control discount on Mr. Murphy's limited partner interest in the MFLP is appropriate.  Accordingly, the Court adopts the valuation of Donald Barker and finds that on the Valuation Date the non-controlling, marketable value of Mr. Murphy's 95.25365% limited partner interest in the MFLP to be $110,365,500 (net asset value of limited partner interest ($126,132,000) – 12.5% lack of control discount ($15,766,500) = $110,365,500).

2) Lack of Marketability Discount

There is no ready market for Mr. Murphy's 95.25365% limited partner interest in the MFLP.  Therefore, to determine the fair market value of his limited partner interest, the non-controlling, marketable value of his partner interest ($110,365,500) should to be adjusted for the interest's lack of marketability.[46]  The size of this discount is in dispute.

---

[46] This adjustment reflects the fact that there is no ready market for shares in a closely-held family entity.

In determining the appropriate lack of marketability discount to apply to Mr. Murphy's partnership interest, both Barker and Burns looked at studies of restricted stock transactions. These studies measure the discount at which restricted shares trade in private transactions as compared to the trading price of the stock's publicly traded counterpart.  In making his determination, Barker relied primarily on the data from three studies (FMV Opinions, Management Planning (MPI), and Silber), comparing this data to the holding period, relative risk, distribution policy, and transfer restrictions of Mr. Murphy's partner interest.  In doing so, Barker realized that the "holding period" for Mr. Murphy's partner interest was substantially longer than that of restricted stock (one to two years).[47]   Taking this into consideration, Barker determined the appropriate lack of marketability discount to be 32.5%.

In making his determination Burns not only considered restricted stock studies, he also considered studies regarding sales of restricted stocks before the SEC's enactment of Rule 144A (easing the trading of restricted stock among qualified institutional buyers) and after its enactment.  These studies showed a 12% decline in the average discount after the enactment of Rule 144A.  Burns reasoned that this decline reflects the discount that investors require for having virtually no resale market.  He did not consider the longer "holding period" for Mr. Murphy's limited partner interest in determining the marketability discount to be applied.  From this, Burns determined the appropriate lack of marketability discount to be 10%.

---

[47]   The term of the MFLP ends on January 1, 2050.  Unanimous consent of all partners is required to liquidate the partnership prior to this date.  Partners are not allowed to withdraw from the Partnership and there are restrictions on the transferability of partnership interests.  From this, Barker reasoned that the holding period for a hypothetical buyer of a MFLP interest is significantly longer than that of restricted stocks. The Court agrees.

In reviewing the expert reports and the testimony at trial, the Court finds Barker's valuation analysis more credible than Burns' analysis; thus, a 32.5% lack of marketability discount on Mr. Murphy's limited partner interest in the MFLP is appropriate.  Accordingly, the Court adopts the valuation of Donald Barker and finds that on the Valuation Date the fair market value of Mr. Murphy's 95.25365% limited partner interest in the MFLP to be $74,500,000[48] (non-controlling, marketable value of Mr. Murphy's 95.25365% limited partner interest in the MFLP ($110,365,500) – 32.5% lack of marketability discount ($35,868,788) = $74,496,712).

## II. Fair Market Value of Mr. Murphy's LLC Interest

Mr. Murphy owned a 49% member interest in the LLC, the MFLP's general partner.  The LLC's principal asset is its 2.28113% general partner interest in the MFLP.[49]  During the trial, Barker and Burns both testified as to the fair market value of this member interest.  Barker testified that the fair market value of Mr. Murphy's member interest in the LLC was $707,000 on the Valuation Date.  Mr. Burns testified that the fair market value of Mr. Murphy's member interest was $1,099,486.

In determining the value of Mr. Murphy's member interest in the LLC, both Barker and Burns applied the net asset value approach.  Under this approach, the fair market value of the member interest is determined by first deriving the net asset value of the 2.28113% general partner interest.  Applicable discounts are then applied to this net asset value to determine the fair market value of the 2.28113% general partner interest.  Once the general partner's fair market value is determined, the LLC's net asset value (total assets – liabilities) is multiplied by Mr.

---

[48] This figure has been rounded.

[49] On the Valuation Date, the only other asset of the LLC was $245 in cash.

Murphy's percentage interest in the LLC (49%) to determine his pro rata net asset value. This pro rata net asset value is then discounted for lack of control and lack of marketability to obtain the fair market value of Mr. Murphy's 49% member interest in the LLC.

In determining the value of the LLC's general partner interest in the MFLP, both Barker and Burns concluded that lack of control and lack of marketability discounts were appropriate. The size of these discounts are in dispute.

In determining the appropriate size of discounts to be applied, Barker and Burns applied analyses similar to the analysis each applied in valuing Mr. Murphy's limited partner interest. Under his analysis, Barker determined that a combined 20% lack of control/lack of marketability discount was appropriate in valuing the general partner interest. Under his analysis, Burns determined that a combined 14.5% lack of control/lack of marketability discount was more appropriate.

In reviewing the expert reports and the testimony at trial, as before, the Court finds Barker's valuation analysis more credible than Burns'analysis; thus, a combined 20% lack of control/lack of marketability discount on the value of the general partner interest is appropriate. Accordingly, the Court adopts the valuation of Donald Barker and finds that on the Valuation Date the fair market value of the 2.28113% general partner interest to be $2,416,000.[50] (net asset value of general partner interest ($3,020,593) – 20% lack of control/lack of marketability discount ($604,119) = $2,416,474 ). The net asset value of the LLC on the Valuation Dates was $2,414,995 (fair market value of 2.28113% general partner interest ($2,416,000) + cash ($245) – liabilities ($1,250) = net asset value of LLC ($2,414,995)). The pro rata net asset value of Mr.

---

[50] This figure has been rounded.

Murphy's 49% member interest in the LLC on the Valuation Date was $1,183,348 (net asset value of LLC ($2,414,995) x 49% member interest = pro rata net asset value of member interest ($1,183.348)).

In determining the fair market value of Mr. Murphy's 49% member interest in the LLC, both Barker and Burns concluded that lack of control and lack of marketability discounts were appropriate.  In determining the appropriate size of these discounts, Barker and Burns applied analyses similar to the analysis each applied in valuing Mr. Murphy's limited partner interest. Applying his analysis, Barker determined that a 11.1% lack of control discount and a 32.5% lack of marketability discount should be applied to Mr. Murphy's member interest.  Applying his analysis, Burns determined that a 5% lack of control discount and a 10% lack of marketability discount was more appropriate.

In reviewing the expert reports and the testimony at trial, as before, the Court finds Barker's valuation analysis more credible than Burns'analysis; thus, a 11.1% lack of control discount and a 32.5% lack of  marketability discount on the net asset value of Mr. Murphy's member interest is appropriate.  Accordingly, the Court adopts the valuation of Donald Barker and finds that on the Valuation Date the fair market value of Mr. Murphy's 49% member interest in the LLC was $710,000[51] (net asset value of 49% member interest in LLC ($1,183,348) – 11.1% lack of control discount ($131,352) = marketable, non-controlling value of member interest ($1,051,996) – 32.5% lack of marketability discount ($341,898) = $710,098 ).

### III.  Fair Market Value of Murphy Artwork

In addition to the dispute over the value of Mr. Murphy's limited partner interest in the

---

[51] This figure has been rounded.

MFLP and his member interest in the LLC, there is a dispute over the value of four works of art

owned by Mr. Murphy at the time of his death.  At trial, Richard Lynch[52] and Peter Fairbanks[53]

testified on behalf of the Estate as expert witnesses giving their opinions as to the fair market

value of the four works of art in dispute.  Stuart Feld[54] testified on behalf of the IRS.  Also before

the Court was the apprisal of the IRS' Art Advisory Panel[55] (the "Art Panel").  Each expert, along

with the Art Panel, based their opinions on the condition of the art work, the relative quality of

the work as compared to other works by the same artist and the sales of comparable and relevant

works by the same artist.  Based upon this criteria, Lynch valued the four works of art in dispute

at $292,000; Fairbanks valued the works of art at $330,000; the Art Panel valued the works of art

at $525,000; and Feld valued the works of art at $1,625,000.  In reviewing the expert reports and

the testimony at trial, it is apparent that Feld's appraisal is out of line with the appraisals of the

other two experts and the IRS' own Art Panel.  Feld also used comparable sales that were remote

---

[52] Richard Lynch is President and Director of Hammer Galleries in New York City.  He has been an art dealer for over thirty years and has been involved in the purchase and sale of a number of Childe Hassam and Edgar Degas's works.  He is a member of the American Appraisal Society.  Mr. Lynch first prepared his apprisal in 2002 for use in the Estate's tax return.

[53] Peter Fairbanks is President and Owner of Montgomery Gallery in San Francisco, California.  He has over thirty-four year experience as an art appraiser and is currently an art appraiser on the television series, The Antiques Road Show.  Fairbanks is a member of the Appraisers Association of America, the Art Dealers Association of America and is President of the San Francisco Art Dealears Association.

[54] Stuart Feld is the Owner, Director and President of Hirschl & Adler Galleries in New York City.  His gallery has sold a number of Childe Hassam paintings and Edgar Degas works.  He is in the process of compiling a catalogue raisonné (a record of an artist's works of art) for Childe Hassam.  Feld was a member of the IRS's Art Advisory Panel in the 1970s.

[55] The Art Advisory Panel is comprised of twenty-five (25) individual who are experts in various art disciplines.  They includes art dealers, scholars and art historians.

in time or after the Valuation Date in valuing the works by Hassam, Degas and Clague.  The Court finds Feld's valuation conclusions to be problematic and, thus, gives them considerably less weight in determining the fair market value of the four works in dispute.

    A.  Childe Hassam, *A Stroll in the Park*

    Childe Hassam's *A Stroll in the Park* (circa 1890) is an early oil on a mahogany panel of a mother and daughter strolling in the Luxembourg Gardens, Pairs.  It is loosely painted and is more of a study or oil sketch.  The painting size is 12 x 8 ⅞ inches and is signed by the artist. The painting is in good to excellent condition.

    In valuing *A Stroll in the Park,* Lynch, Fairbanks and the Art Panel all used Hassam's *Rue de la Madeleine, Place de l'Opera* as the most comparable to *A Stroll in the Park.*  However, all agreed that *Rue de la Madeleine* was a superior painting to the Murphy Hassam.  *Rue de la Madeleine* sold in April 2002, five months before the Valuation Date, for $229,500.  Based upon the painting's condition, quality, and the comparable sales,  Lynch valued *A Stroll in the Park* for $150,000, Fairbanks gave it a value of $170,000, and the Art Panel valued it at $185,000.

    Feld also used *Rue de la Madeleine* as a comparable work in determining the value of *A Stroll in the Park.*  However, he believed the Murphy Hassam to be superior to *Rue de la Madeleine*.  In addition to *Rue de la Madeleine*, Feld considered Hassam's *Rooftop Garden, Paris* that sold in May 2003 for $623,500,  his *Dans le Parc, Paris* that sold in December 1996 for $1,267,500, and five other Hassam paintings that sold between 1983 and 1993 for prices ranging from $115,000 to $925,000.  Hassam's *Rooftop Garden* is larger and more colorful than *A Stroll in the Park.*  It also sold eight months after the Valuation Date.  *Dans le Parc, Paris* and the other five Hassam paintings sold six, nine, thirteen, sixteen and nineteen years before the

Valuation Date.  Based upon the condition and quality of the painting and his comparable sales, Feld valued *A Stroll in the Park* for $850,000.

In reviewing the expert reports and the testimony at trial, the Court finds that Feld's valuation of *A Stroll in the Park* is based primarily upon sales that occurred either after the Valuation Date or that are too remote in time to be considered relevant and on the sale of a work that is far superior to the Murphy Hassam.  The Lynch, Fairbanks and Art Panel's valuations of the painting are more credible than Feld's valuation.  They provide a better indication of the fair market value of the painting. Therefore, the Court finds that the fair market value of the Murphy Hassam, *A Stroll in the Park,* was $185,000 on the Valuation Date.

B.  Edgar Degas, *Danseuse Espagnole*

Edgar Degas's *Danseuse Espagnole* (circa 1882) is an unfinished charcoal and pastel sketch on mauve paper of a Spanish dancer.  The size of the drawing is 11¼ X 9 inches and is stamped with the Degas estate stamp.  It is not signed by the artist.  The drawing is in poor to good condition.

In valuing *Danseuse Espagnole*, Lynch and Fairbanks both used Degas's *Danseuse, le bras horizontal* as comparable to Degas's *Danseuse Espagnole.  Danseuse, le bras horizontal* is a charcoal drawing more realized than the Murphy Dagas; however, it does not have the pastel coloring of  *Danseuse Espagnole.*  Therefore, it is considered inferior to the Murphy Degas. *Danseuse, le bras horizontal* sold in April 2002, five months before the Valuation Date, for $32,076.  Fairbanks also considered three other comparable sales in 2002.  One was for an inferior charcoal drawing (*Femme nue debout)* that sold for $30,387 and the other two drawings were superior in execution, one being a finished watercolor (*Jeune italienne en costume de*

36

*paysanne*) that sold for $51,485 and the other, a finished charcoal and pastel drawing (*Après le bain*) signed by Degas, that sold for $63,757.   Based upon the condition and quality of the drawing and their comparable sales, Lynch valued *Danseuse Espagnole* for $50,000 and Fairbanks valued the drawing for $45,000.

In valuing *Danseuse Espagnole*, the Art Panel viewed five Degas drawings sold between 1998 and 2001.[56]  These sales were charcoal and wash or charcoal and pastel drawings of the more desirable French ballerinas drawn by Degas.  The prices of these drawings ranged from $73,764 to $85,000.  Based upon the quality of the drawing and these comparable sales, the Art Panel valued the Murphy Degas at $100,000.

Feld viewed four works as comparable to the Murphy Degas.  These works included *Danseuse a la barre,* that sold in May 2000 for $225,000; *Etude de danseuse,* that sold in November 2000 for $243,200; *Danseuse debout*, that sold in November 2002 for $150,300; and *A Dancer,* that sold in January 2001 for $75,500.[57]  These works are ink and pastel, charcoal and pastel, crayon, and charcoal and wash drawings of the more desirable French ballerinas drawn by the artist.  Based upon the drawing's appeal and his comparable sales, Feld valued *Danseuse Espagnole* for $150,000.

In reviewing the expert reports and the testimony at trial, the Court finds that the valuations of the Art Panel and Feld are based on sales of drawings by Degas of his most popular

---

[56] *Danseuse pratiquant a la barre* sold in 1998 for $85,000; *Danseuse* sold in 1998 for $74,000;  *A Dancer* sold in 2001 for $75,500; *Danseuse réajustant son chausson* sold in 2000 for $73,764; and *Danseuse les bras levés* sold in 2000 for $80,543.

[57] Degas's drawing *A Dancer* was also viewed by the Art Panel as a comparable.

and desirable subject, the French ballerina.[58]  These drawings are also more realized than the Murphy Degas.[59]  The Lynch and Fairbank valuations of *Danseuse Espagnole* are more credible than those of the Art Panel and Feld.  They provide a better indication of the fair market value of this painting.  Therefore, the Court finds that the fair market value of the Murphy Degas, *Danseuse Espagnole*, was $50,000 on the Valuation Date.

C.  Richard Clague, *New Orleans Landscape*

Richard Clague's *New Orleans Landscape* (circa 1857) is an oil on canvas of a large Louisiana oak and red barn by a road beneath a twilight sky.  It is a very dark landscape.  The painting size is 24 x 33½ inches and is signed by the artist.  It is in poor to fair condition.

In valuing *New Orleans Landscape,* all the experts note that Clague is a regional artist with market appeal primarily in his home state of Louisiana.  Therefore, sales of his works are scarce.  Lynch used three Clague works (*Louisiana Cabins under the Live Oaks; Bayou Landscape;* and *Oak Tree Swamp Landscape with Hanging Man*) as comparables.  These paintings sold in1998 for $27,500 (*Oak Tree Swamp Landscape with Hanging Man*), $46,200 (*Bayou Landscape*) and $56,100 (*Louisiana Cabins under the Live Oaks*).  All three works are smaller than the Murphy Clague.  Based upon these comparables and the fair condition of the painting, Lynch valued *New Orleans Landscape* for $42,000.

Fairbanks also used *Oak Tree Swamp Landscape with Hanging Man* as a comparable in determining the value of the Murphy Clague.  In addition, he viewed another Clague landscape

---

[58] The Murphy Degas is a sketch of a Spanish dancer.

[59] The Murphy Degas is an unfinished sketch.  She is missing her left arm and part of her right hand.

*Fisherman on the Louisiana Bayou* which sold in June 2003 for $28,750.  As with *Oak Tree Swamp Landscape with Hanging Man*, *Fisherman on the Louisiana Bayou* is smaller than the Murphy Clague.  Based upon these comparables and the poor condition of the painting, Fairbanks valued *New Orleans Landscape* for $30,000.

In valuing *New Orleans Landscape,* the Art Panel viewed five Clague paintings sold between 1993 and 2003.[60]  The sale prices of these paintings ranged from $28,500 to $189,500.  Based upon these comparables and the good condition[61] of the painting, the Art Panel valued the Murphy Clague for $150,000.

Clague's *Backyard in Algiers* is the only comparable viewed by Feld in making his determination of the value of Murphy Clague.[62]  It sold in February 2003, five months after the Valuation Date, for $189,500.  *Backyard in Algiers* is smaller than *New Orleans Landscape,* but is in very good condition.  Based upon that sale, the size of the Murphy Clague (*Backyard in Algiers* is one-half the size of *New Orleans Landscape*), and the fair condition of the painting, Feld valued *New Orleans Landscape* for $350,000.

In reviewing the expert reports and the testimony at trial, it is apparent that Feld and the Art Panel placed great weight on the sale of Clague's *Backyard in Algiers* that sold in February 2003, five months after the Valuation Date.  It is also apparent that they did not consider the poor

---

[60] *Bayou Settlement* sold in 1993 for $77,000; *Louisiana Cabins under the Live Oaks* sold in 1998 for $56,100; *Bayou Landscape* sold in 1998 for $46,200; *Fisherman on the Louisiana Bayou* sold in 2003 for $28,750; and *Backyard in Algiers* sold in 2003 for $189,500.

[61]  The Art Panel valuation is based upon the assumption that the painting was in good condition.

[62] In his report, Feld does mention the sale of Clague's *Rural Landscape* that sold in May 2005 for $446,500.  However, it does not appear that he based his valuation on this sale.

condition of *New Orleans Landscape* when making their determination of the painting's value. Thus, the Court finds the valuations of Lynch and Fairbanks more credible than the valuations of the Art Panel and Feld. They provide a better indication of the fair market value of this painting. Therefore, the Court finds that the fair market value of the Murphy Clague, *New Orleans Landscape*, was $42,000 on the Valuation Date.

    D.  Emil Nolde, *Landscape with Yellow and Blue Sky*

    *Landscape with Yellow and Blue Sky* (circa 1934) is a watercolor on paper by German Expressionist, Emil Nolde. The size of the watercolor is 13½ x 18½ inches. It is signed by the artist and is in excellent condition. *Landscape with Yellow and Blue Sky* is a very appealing watercolor of good quality.

    In valuing *Landscape with Yellow and Blue Sky,* Lynch, Fairbanks and the Art Panel all used Nolde's *Marschlandschaft mit hohen grauen Wolken, inter alia,* as comparable to the Murphy Nolde. It sold in June 2002, three months before the Valuation Date, for $86,444. Fairbanks and the Art Panel believed that *Marschlandschaft mit hohen grauen Wolken* was the most comparable of all the comparables they viewed because it was similar in size (13.8 x 18.1 inches) and sold close to the Valuation Date. Based upon the painting's condition, quality, size and the comparable sales, Lynch valued *Landscape with Yellow and Blue Sky* for $50,000, Fairbanks gave it a value of $85,000, and the Art Panel valued it at $90,000.

    Feld did not use *Marschlandschaft mit hohen grauen Wolken* as a comparable in valuing the Murphy Nolde. Rather, he viewed two other works by the artist. The first was Nolde's *Landschaft mit Bauernhaus* that sold in June 2001 for $73,617. He also viewed a watercolor titled *Meer mit Damofern unter gelberm Himmel* that sold in October 2001 for $262,523. Based

upon these comparables, Feld valued *Landscape with Yellow and Blue Sky* for $275,000.

In reviewing the expert reports and the testimony at trial, the Court finds that Nolde's *Marschlandschaft mit hohen grauen Wolken* is the most comparable to *Landscape with Yellow and Blue Sky* and should be used in valuing the Murphy Nolde. Lynch, Fairbanks and the Art Panel all used the sale of this work in making their valuations. Feld did not. Thus, the Lynch, Fairbanks and Art Panel valuations of *Landscape with Yellow and Blue Sky* are more credible than Feld's valuation. They provide a better indication of the fair market value of this watercolor. Therefore, the Court finds that the fair market value of the Murphy Nolde, *Landscape with Yellow and Blue Sky,* was $90,000 on the Valuation Date.

Thus, the Court hereby determines that on the Valuation Date the value of the artwork in dispute is: Childe Hassam, *A Stroll in the Park*: $185,000; Edgar Degas, *Danseuse Espagnole*: $50,000; Richard Clague, *New Orleans Landscape*: $42,000; and Emil Nolde, *Landscape with Blue and Yellow Sky*: $90,000 for a total value of $367,000.

## IV. Deduction of Interest Expense Under Section 2053

Section 2053(a) allows for the deduction of administrative expenses that are "actually and necessarily incurred." *See* Treas. Reg. § 20.2053-3(a). The Estate seeks to deduct the interest expense on two loans (the MFLP loan and the 1956 Trusts loan) incurred during the administration of Mr. Murphy's Estate. The interest on the loan from the MFLP totals $3,170,250, an amount that is fixed and ascertainable. This interest is also actually and necessarily incurred. The Estate is entitled to deduct the $3,170,250 of interest on the MFLP loan as a reasonable and necessary administration expense under section 2053.

The interest paid to date on the loan from the 1956 Trusts is also actually and necessarily

incurred.  Therefore, the Estate is entitled to deduct the amount of interest actually paid to date

on the 1956 Trusts loan as a reasonable and necessary administrative expense under section

2053.

### V.  Burden of Proof Under Section 7491

Usually, the taxpayer bears the burden of proving the IRS' determinations are in error.

Rule 142(a).  However, with respect to a factual issue relevant to the liability of the taxpayer for

tax, the burden of proof may shift to the IRS if the taxpayer produces credible evidence with

respect to that issue.  I.R.C. § 7491(a)(1).  In order for the burden to shift, the taxpayer must also

have met substantiation requirements, maintained records, and cooperated with the Service's

reasonable requests for information, documents, witnesses, meetings, and interviews.  I.R.C. §

7491(a)(2).  The Estate argues that the burden of proof has shifted on all factual issues in this

case  because it has produced credible evidence with regard to all issues and complied with its

duty to maintain records, substantiate all requested items, and cooperate with the Service.

The Court's resolution of the issues in this case is based upon the preponderance of the

evidence rather than the allocation of the burden of proof.  "The shifting of an evidentiary burden

of preponderance is of practical consequence only in the rare event of an evidentiary tie ...."

*Polack v. Comm'r,* 366 F.3d 608, 613 (8th Cir. 2004) (quoting *Cigaran v. Heston,* 159 F.3d 355,

357 (8th Cir. 1998)).  Therefore, the Court need not reach this issue because even with the

burden placed on the Estate, it has succeeded as to the issues in dispute.  A ruling on the

allocation of burden of proof will not alter the Court's decision in this matter.

## <u>CONCLUSIONS OF LAW</u>

The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1346(a)(1) and 26

U.S.C. section 7422.

Federal estate tax is imposed on property a decedent transfers at death without regard to the nature of the property.  I.R.C. § 2033; *Estate of Bright v. United States,* 658 F.2d 999, 1001 (5th Cir. 1981).  The gross estate includes the fair market value of all of a decedent's property to the extent provided in sections 2033-2044.  I.R.C. § 2031(a).  Under section 2036(a), the value of inter vivos transfers that were testamentary in nature are included in the decedent's gross estate. *Estate of Korby v. Comm'r,* 89 T.C.M. (CCH) 1150, 1153 (2005) (citing *United States v. Estate of Grace,* 395 U.S. 316, 89 S.Ct. 1730, 23 L.Ed.2d 332 (1969)).  It provides that if a decedent makes an inter vivos transfer of property, other than a bona fide sale for adequate and full consideration, and retains certain enumerated rights or interests in the property that are not relinquished until death, the full value of the transferred property will be included in the decedent's gross estate.  I.R.C. § 2036(a).  Thus, section 2036 does not apply to a transfer that is "a bona fide sale for adequate and full consideration in money or money's worth." *Estate of Korby,* 89 T.C.M. at 1153.  The determination as to whether a transfer is a bona fide sale is an objective inquiry.  *Estate of Kimbell v. United States,* 371 F.3d 257, 263-64 (5th Cir. 2004).

In this case, the IRS claims that the value of the property transferred by Mr. Murphy to the MFLP and the LLC is includable in his gross estate under section 2036(a)(1) and (2).  The Estate argues that section 2036 does not apply to the transfer as it falls within the exception to section 2036, i.e., it is "a bona fide sale for adequate and full consideration."  The availability of the bona fide sale exception has two requirements: 1) the bona fide sale, and 2) adequate and full consideration.

For a transfer to be a bona fide sale within the meaning of section 2036, it must be made

43

in good faith with "some potential benefit other than the potential estate tax advantages that might result from holding assets in the partnership form." *Estate of Korby v. Comm'r,* 471 F.3d 848, 853 (8th Cir. 2006) (quoting *Estate of Thompson v. Comm'r,* 382 F.3d 367, 383 (3rd Cir. 2004)).  However, if the transfer is motivated solely by potential tax savings without a business purpose, the transfer is ignored for tax purposes.  *Estate of Kimbell v. Comm'r,* 371 F.3d at 264.

In this case, the MFLP was created for various purposes, among them to pool the family's Legacy Assets into one entity to be centrally managed in a manner that was consistent with Mr. Murphy's long-term business/investment philosophy.  In order to accomplish this goal, Madison has taken an active role in the management of these Legacy Assets, serving on the Board of Directors of each company.  The partnership has also purchased and is managing property (Epps Plantation and the Union Building) that is consistent with Mr. Murphy's philosophy of acquiring and maintaining the family's historical assets.  This is a legitimate and significant non-tax purpose for creating the MFLP.  *See Estate of Schutt v. Comm'r,* 89 T.C.M. (CCH) 1353, 1367, 2005 WL 1244686 (2005); *Estate of Mirowski v. Comm'r,* 95 T.C.M. (CCH) 1277, 1281, 2008 WL 795017 (2008); *Estate of Stone v. Comm'r,* 86 T.C.M. (CCH) 551, 580, 2003 WL 22520101 (2003).  Mr. Murphy also retained approximately $130 million outside the partnership.  Thus, he was not dependant on distributions from the partnership in order to maintain his lifestyle.  *See Estate of Thompson v. Comm'r,* 382 F.3d 367 (3rd Cir. 2004).  He also did not treat the partnership's assets as his own and did not commingle his assets with those of the partnership. *Id.*  During the formation of the MFLP, Mr. Murphy's two children, Madison and Martha, took an active role, with Martha being represented by her own attorney.  Thus, Mr. Murphy was not effectively standing on both sides of the transaction.  *See Estate of Hillgren v. Comm'r,* 87

44

T.C.M. (CCH) 1008, 2004 WL 388988 (2004).

The IRS argues that the creation of the MFLP was not for a legitimate non-tax purpose because Mr. Murphy knew of the tax advantages associated with the partnership's creation. However, tax advantages do not "prevent a sale from being 'bona fide' if the transaction is otherwise real, actual and genuine." *Estate of Kimbell,* 371 F.3d at 264. It also argues that the creation of an entity that primarily owned Murphy Oil, Deltic and BancorpSouth stock is not a legitimate non-tax purpose because the stock was to be held long term and was not being actively managed. However, courts have held that entities that have a buy and hold investment strategy offer just as much justification as entities based upon a philosophy that focuses on active trading. *Estate of Schutt,* 89 T.C.M. at 1367. The Court also does not agree that the MFLP's assets, i.e., the Murphy Oil, Deltic, and BancorpSouth stock, were not actively managed. The evidence is clear that Madison took an active role in the management of Murphy Oil, Deltic and BancorpSouth, by serving on each company's Board of Directors. This active involvement enabled him to ensure the growth and continued success of the MFLP's assets. Thus, the Court finds that Mr. Murphy's transfer of assets to the MFLP was a bona fide sale.

In determining if a bona fide sale was for adequate and full consideration, the proper focus is 1) whether the interest in the partnership received is proportionate to the value of the assets contributed to the entity, 2) whether the value of each partner's contribution is credited to the partner's capital account, and 3) whether on termination or dissolution of the partnership, each partner is entitled to distributions from the partnership in amounts equal to their respective capital accounts. *See Estate v. Kimbell,* 371 F.3d at 266. The IRS argues that the Court should not apply the *Kimbell* test in making its determination whether a bona fide sale is for adequate

and full consideration.  The Court is not persuaded by its argument.

In this case, Mr. Murphy received partnership interests proportionate to the value of the assets he contributed.  The value of the assets contributed by each partner was credited to his, her or its respective capital account.  And, on dissolution of the partnership, each partner is entitled to distributions in an amount equal to his, her or its capital account.  Thus, under the criteria set forth in *Kimbell*, Mr. Murphy's transfer of assets to the MFLP was for adequate and full consideration.

Mr. Murphy's transfer of assets to the MFLP and the LLC was a bona fide sale for adequate and full consideration in money or money's worth.  Thus, the transfer falls within the bona fide sale exception to section 2036.  Accordingly, the fair market value of these assets is not includable in Mr. Murphy's gross estate under section 2036.

The value of Mr. Murphy's interest in the MFLP and the LLC are to be, and have been established by applying the hypothetical buyer and seller method, i.e., the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.  Treas. Reg. § 20.2031-1(b).  When determining the fair market value of an interest in a partnership, one must value the interest, not the decedent's share of the assets in the entity.  This valuation includes taking into consideration such price adjustments as lack of control and lack of marketability discounts.  After taking the appropriate discounts into consideration, the Court finds that on the Valuation Date the fair market value of Mr. Murphy's limited partner interest in the MFLP to be $74,500,000 and the fair market value of Mr. Murphy's member interest in the LLC to be $710,000.

The Estate seeks to deduct the interest expense on two loans incurred by it during the administration of Mr. Murphy's estate.  The first loan was incurred in December 2002 when the Estate borrowed $11,040,000 from the MFLP to pay a portion of the Estate's taxes.  The second loan was incurred in September 2006 when the Estate borrowed $41.8 million from the 1956 Trusts to pay the additional tax asserted by the IRS in the Notice of Deficiency.  The Estate claims this interest is properly deductible as a reasonable and necessary administrative expense under section 2053.  The IRS contends that the interest expense is not deductible under section 2053.

Section 2053(a)  allows for the deduction of administrative expenses that are "actually and necessarily incurred."  *See* Treas. Reg. § 20.2053-3(a).  Borrowing money to pay the estate tax of an illiquid estate is a "necessarily incurred" administrative expense under section 2052.  *McKee v. Comm'r,* 72 T.C.M. (CCH) 324, 1998 WL 443135 (1998); *Estate of Todd v. Comm'r,* 57 T.C. 288, 296 (1971).  Therefore, an estate may properly deduct the interest on such loans.[63]

The IRS first argues that the interest expense was not necessarily incurred because it was the result of an unnecessary estate-tax-avoidance transfer made by Mr. Murphy during his lifetime that drained his future estate of liquid assets.  The Court does not agree.

Mr. Murphy created the MFLP in good faith and for legitimate and significant non-tax purposes .  At the time of the transfer, Mr. Murphy retained approximately $130 million in assets

---

[63] The Court notes that before interest may be deductible as an administrative expense, it must be allowed under the law of the State in which the estate is being administrated.  Under Arkansas law (ARK. CODE ANN. § 28-69-304), an executor is permitted to borrow money and repay loans, including principal and interest.  Thus, Madison and Martha had the authority under Arkansas law to incur the loans from both the MFLP and the 1956 Trusts.

outside the partnership.  These assets represented over 50% of Mr. Murphy's wealth and were sufficient to pay his living expenses for the remainder of his life and to pay his estate taxes upon his death.  The deficit that resulted in the Estate having to borrow money to pay the estate taxes was caused by the value of the assets outside the partnership declining in value and the value of the partnership's assets increasing in value, not by Mr. Murphy depleting his wealth to avoid taxes.

The IRS also argues that the interest expense was not necessarily incurred because the Estate could have obtained the funds to pay the estate taxes by other means than borrowing the money.  The MFLP could have sold assets, i.e., Murphy Oil and BancorpSouth stock, and distributed the proceeds to the Estate to pay the taxes.  However, the executor of an estate is not required to set aside good business judgment when administering an estate.  If the executor acted in the best interest of the estate, the courts will not second guess the executor's business judgment.  *McKee,* 72 T.C.M. at 333.  In this case, there is no evidence that Madison and Martha, as the executors of the Estate and as the controlling owners of the MFLP's general partner, were not acting in the best interest of the Estate and the MFLP when they chose to borrow the funds necessary to pay the Estate's taxes, rather than to liquidate assets.  The Court will not second guess their judgment.  Therefore, the Court finds that the interest expense incurred on the MFLP and the 1956 loans was a reasonable and necessary administrative expense of the Estate.  The interest on both loans is properly deductible by the Estate under section 2053.

Interest expense that is actually and necessarily incurred is immediately deductible if the amount is fixed and ascertainable.  In this case, the Estate seeks to deduct the total amount of interest on the loan from the MFLP to the Estate ($3,170,250) and the amount actually paid on

the loan from the 1956 Trusts to the Estate ($5,725,300 as of February 2009).

The loan from the MFLP to the Estate is for a fixed term, has a fixed rate of interest, and does not permit early payment of the loan.  The amount of interest to be paid over the life of the loan is "not vague or uncertain but instead is capable of calculation."  *Estate of Graegin v. Comm'r,* 56 T.C.M. (CCH) 387, 391, 1988 WL 98850 (1988).  Thus, the Estate is entitled to deduct the $3,170,250 of interest on the MFLP loan as a reasonable and necessary administration expense under section 2053.

The loan from the 1956 Trusts to the Estate has a floating rate of interest and permits early payment of the loan.  Only the amount of interest paid to date is ascertainable.  Thus, the Estate is entitled to deduct the amount of interest actually paid to date on the 1956 Trusts loan as a reasonable and necessary administrative expense under section 2053.

## CONCLUSION

Based upon the above findings of fact and conclusions of law, the Court finds that the Estate is entitled to a refund of federal estate taxes and interest paid in an amount to be determined by subsequent computations consistent with these findings and other agreements of the parties.

IT IS SO ORDERED, this 2nd day of October, 2009.

`                                                    /s/Harry F. Barnes

                                                    Hon. Harry F. Barnes
                                                    United States District Judge